**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                    :

KEVIN RAGLAND,            :

              Plaintiff,    :          **No. 18-CV-8206 (OTW)**

       -against-        :

                    :          **OPINION & JUDGMENT**

                    :

ANDREW M. SAUL, Commissioner of Social  :
Security,[1]                  :

             Defendant.   :

---------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

I.   **Introduction**

Plaintiff Kevin Ragland ("Plaintiff"), proceeding *pro se*, brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. §405(g), seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") denying his application for

supplemental security income ("SSI"). Before the Court is the Commissioner's Motion for

Judgment on the Pleadings, made pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

To date, Plaintiff has not served or filed any opposition to the motion, nor has he requested an

extension of time in which to serve opposition papers. Notwithstanding Plaintiff's failure to

respond, I shall consider the merits of the Commissioner's motion. For the reasons set forth

below, the Commissioner's Motion for Judgment on the Pleadings is **DENIED**, and the case is

remanded for further proceedings pursuant to 42 U.S.C. §405(g).

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the
Court substitutes Andrew M. Saul for Defendant "Commissioner of Social Security."

II.   **Statement of Facts**[2]

A.   **Procedural Background**

Plaintiff applied for both disability insurance benefits ("DIB") and SSI on April 13, 2015.

(Tr. 155, 162). Plaintiff alleged a disability onset date of January 1, 2010, listing impairments of

back pain, asthma, "COPD," "[a]tonic bladder problem," and prostate infection. (Tr. 63).

Plaintiff later added that since August 2015, he was also suffering from depression and anxiety.

(Tr. 187). In a letter dated April 18, 2015, the Commissioner notified Plaintiff that he was not

eligible for DIB because he did not work long enough to qualify for DIB. (Tr. 73). Plaintiff

received another letter dated July 1, 2015, which notified Plaintiff that his SSI claim was denied

because he was not found to be disabled. (Tr. 77, 81).

After Plaintiff requested a hearing on his SSI claim before an Administrative Law Judge

("ALJ"), (Tr. 83), ALJ Sharda Singh conducted a video hearing on April 12, 2017, at which both

Plaintiff (represented by counsel) and vocational expert Robert Baker gave testimony. (Tr. 31-

62). On October 25, 2017, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr.

14-26). The Appeals Council then granted Plaintiff two extensions of time to submit a statement

or provide additional evidence, after which Plaintiff's counsel submitted a five-page brief. (Tr. 7,

9). On July 9, 2018, the Appeals Council subsequently denied Plaintiff's request for review of

the ALJ's decision, rendering the Commissioner's decision final. (Tr. 1-3). Plaintiff then filed an

action for review in this Court on September 5, 2018. (ECF 1).

---

[2] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed in accordance with 42 U.S.C. § 405(g). *See* Administrative Record, dated October 23, 2018, ECF 15 ("Tr.").

### B.  Social Background

Plaintiff was born in 1966 and previously worked as a painter from 2005 through 2008. (Tr. 162, 180). Before that, Plaintiff worked various manual labor jobs. (Tr. 180). After having difficulty finding work as a painter, Plaintiff stopped working in 2008 and lived for two years as an apartment superintendent. (Tr. 46). Plaintiff left the apartment in 2010 and was homeless until 2015. (*Id*.) In 2015, a homeless shelter helped Plaintiff find an apartment in Middletown, New York with the aid of government assistance. (Tr. 44, 46-47). At the time of the ALJ hearing in 2017, Plaintiff was living by himself in the second-floor Middletown apartment. (Tr. 44-45).

Plaintiff reported that he watched television and read when he could, but that he often needed to move around, including walking outdoors, to alleviate his pain. (Tr. 49). Plaintiff said he did his own cooking and laundry, but a friend helped clean his apartment due to Plaintiff's difficulty in bending over. (Tr. 53).

### C.  Medical Record[3]

#### 1.  Orange Regional Medical Center ("ORMC")

Treatment records from various doctors' visits at the Orange Regional Medical Center were submitted on behalf of Plaintiff.

On May 27, 2013, Plaintiff was seen by Dr. Kurt K. Kloss because of a recent episode of dysuria,[4] which was noted to be a recurrent problem. (Tr. 249). Dr. Kloss recorded that Plaintiff was "[p]ositive for dysuria, hesitancy, urgency, and frequency," and that "[a]ll other systems reviewed . . . [were] negative." (*Id*.)

---

[3] Given the number of medical professionals who treated Plaintiff, the Court will summarize his treatment records chronologically by date of visit and by treatment center.
[4] Dysuria is painful urination. (Tr. 217).

On September 14, 2013, Plaintiff was seen by Dr. Steven Piriano for another episode of dysuria and abdominal pain. (Tr. 254). Plaintiff described his pain as being at a seven out of ten. (*Id*.) Plaintiff was "positive" for abdominal pain, abdominal distention, dysuria, hesitancy, urgency, frequency, decreased urine volume and difficulty urinating, and "[a]ll other systems reviewed [were] negative." (Tr. 255). Dr. Piriano also noted a history of prostatitis and the following impressions:

> 1. Massive distention of the urinary bladder which extends out of the pelvis into the lower abdomen. The urinary bladder was also markedly distended on the prior exam of 2011. Correlate clinically for bladder outlet obstruction. 2. Bullous emphysematous changes in both lung bases, grossly unchanged compared to the prior exam. 3. Remainder of the examination is unremarkable.

(Tr. 257).

On December 11, 2013, Plaintiff was seen by Dr. Vohra for abdominal pain and other similar symptoms he had raised during his prior visits. (Tr. 271). Dr. Vohra noted the following:

> 1. Wall thickening of the rectosigmoid junction rectum. 2. Indeterminate lesion in mid pole of the left kidney[.] 3. Abnormal appearance the pelvis. There is an irregular lobular bladder wall thickening with edema. Primary consideration must be given to epithelial neoplasm or cystitis. 4. Large bulla noted at the right lung base.

(Tr. 284).

Plaintiff was next seen by Dr. Plexousakis on February 15, 2014. (Tr. 296). He complained of urinary retention, "hematuria, mild lower abdominal pain, and vomiting for the past 2 days," and was admitted to the hospital for genitourinary abnormalities. (Tr. 296, 299, 306). Dr. Plexousakis noted "[m]assive distension of the urinary bladder with wall thickening and large blood clots," and diagnosed Plaintiff with hematuria.[5] (Tr. 318). Plaintiff underwent an

---

[5] Hematuria is the presence of blood in urine. (Tr. 472).

operation performed by Dr. Steven J. Rowe on February 16, 2014. (Tr. 324). Dr. Rowe

performed a cystoscopy, clot evacuation, and bladder biopsy. (*Id*.) A Foley catheter was

inserted and "left in postoperatively" given the Plaintiff's massive bladder distention. (Tr. 325).

Pursuant to the bladder biopsy, Plaintiff was further diagnosed with "[u]rothelial mucosa with

chronic cystitis, focal acute cystitis, and associated reactive changes." (Tr. 326). On February 18,

2014, he was discharged. (Tr. 325).

On December 24, 2014, Plaintiff was seen by Dr. Rose Anna Roantree. (Tr. 328). He

complained of "chronic lower back pain that [was] mild in severity and ha[d] been intermittent

since onset several years ago." (*Id*.) He was given Motrin and discharged the same day. (Tr.

331). On February 12, 2015, he returned to ORMC, again presenting with dysuria for 7 days. (Tr.

343). Less than two months later, on April 4, 2015, he presented again with urinary retention

and an inability to insert his catheter. (Tr. 356). Plaintiff was tested and several abnormalities

were detected in his basic metabolic panel, hepatic function panel, CBC differential, and

urinanalysis. (Tr. 348-49). Plaintiff was diagnosed with urinary retention and a urinary tract

infection, and he received a Foley catheter. (Tr. 349-350). He was discharged the same day and

told to follow up with a urologist. (Tr. 351). On July 28, 2015, he presented with similar

symptoms and was diagnosed with hematuria. (Tr. 471).

On September 2, 2016, Plaintiff was admitted to ORMC after presenting with a severe

abscess and cellulitis in his left arm. (Tr. 497-98). Various doctors at the medical center

examined him, the abscess was drained, and he was discharged and provided with medication

on September 7, 2016. (Tr. 499-532). On September 9, 2016, it was noted in Plaintiff's chart

that the abscess was worsening, was relieved by "nothing," and was worsened by draining or

squeezing. (Tr. 540). Plaintiff underwent an incision and drainage procedure to treat the abscess on September 9, 2016. (Tr. 543).

### 2. Crystal Run Health Care ("CRHC")

On March 3, 2015, Plaintiff presented for a urinary tract infection after experiencing pain and burning and was seen by Dr. Rowe. (Tr. 399). Dr. Rowe noted that Plaintiff's pertinent history included self-catheterization. (*Id*.). Plaintiff rated his pain as being a six out of ten. (Tr. 399). Plaintiff was diagnosed with a urinary tract infection, directed to finish his course of antibiotics, and further directed to schedule a follow-up exam in 6 months. (Tr. 401).

On March 16, 2015, Plaintiff presented with lower back pain and an atonic bladder that had an onset date of February 17, 2015. (Tr. 238-247). He was again seen by Dr. Singh, who noted Plaintiff's current medications, which included cefadroxil, ciprofloxacin, and a rubber catheter with directions to administer the self-catheter every four to six hours. (Tr. 244). Plaintiff was examined, completed two health questionnaires indicating pain of seven out of ten and moderate depression, and was referred to Dr. Yeon for a consultation. (Tr. 243-44, 386).

On March 19, 2015, Plaintiff had an orthopedic consultation with Dr. Yeon due to his lower back pain. (Tr. 386). His pain at the time was at a six out of ten. (Tr. 386). Dr. Yeon noted that "[x]-rays show multilevel disc degeneration [and] loss of height with osteophyte formation," diagnosed Plaintiff with lumbar radiculopathy and possible stenosis spondylosis, ordered physical therapy, and prescribed Naprosyn, Neurontin, and Zanaflex. (Tr. 388).

On April 7, 2015, Plaintiff presented with a case of chronic obstructive pulmonary disease ("COPD") that began two days earlier and was seen by Dr. Hulse.[6] (Tr. 381). Plaintiff's

---

[6] COPD is a chronic inflammatory lung disease that causes obstructed airflow from the lungs.

symptoms included chest pressure and discomfort, dyspnea with exertion, excessive sputum, productive cough, and purulent sputum. (Tr. 381). Pulmonary function testing showed a mild obstruction. (Tr. 381). Dr. Hulse's assessment was that Plaintiff was suffering from asthma exacerbation, asthma with COPD, and an upper respiratory infection. (Tr. 383). He prescribed medication and ordered a chest x-ray. (Tr. 383).

On April 13, 2015, Plaintiff presented for a follow-up exam with Dr. Rowe after his April 4, 2015 hospital visit for urinary retention. (Tr. 350-351, 378). Dr. Rowe noted that the problem was severe and Plaintiff had previously rated the pain as a seven out of ten, but that Plaintiff felt fine since his ER visit and the examination was otherwise normal. (Tr. 378-380). Dr. Rowe performed a cystoscopy in the office and diagnosed Plaintiff with an atonic bladder. (Tr. 379).

On May 27, 2015, Plaintiff had an office visit with Dr. Rowe regarding his urinary retention issues. (Tr. 896). Plaintiff's urine cultures from May 11, 2015 and May 8, 2015 both presented findings of e. coli. (Tr. 896). Dr. Rowe noted that Plaintiff had difficulty self-catheterizing prior to having a foley catheter placed over a month ago, and he replaced Plaintiff's catheter. (Tr. 897-98).

On September 1, 2015, Plaintiff saw Dr. Rowe for a consultation, following a referral by Dr. Maria Karimi, regarding his urinary retention. (Tr. 889). Plaintiff's cystoscopy from May 27, 2015 was reviewed with "findings of large capacity." (Tr. 889). Plaintiff's history of self-catheterization was taken into consideration, as were his symptoms of "cloudy urine" and "hematuria." (Tr. 889). Dr. Rowe removed Plaintiff's Foley catheter and advised Plaintiff to resume intermittent self-catheterization with a rubber catheter. (Tr. 890-91).

On September 3, 2015, Plaintiff had an office visit with Dr. Yeon regarding his ongoing lower back pain that radiated into his legs. (Tr. 885). Plaintiff reported that the pain was more prominent in his left leg than his right, but that Plaintiff had been unable to do physical therapy due to "social things that have come up." (*Id*.). The records note that Plaintiff walked "with an antalgic gait favoring the left side." (*Id*.).

On October 28, 2015, Plaintiff underwent a rapid oral screening for HIV and tested negative. (Tr. 748). Plaintiff was tested for hepatitis C on October 30, 2015. (Tr. 749). On December 7, 2015, Plaintiff underwent more testing related to his hepatitis C test results. (Tr. 752). On December 7, 2015 and December 17, 2015, Dr. Atter Shahid stated in a consult note that Plaintiff had tested positive for hepatitis C and "present[ed] for HCV." (Tr. 855, 860).

On February 8, 2016, Dr. Anousheh Ghezel-Ayagh recommended Plaintiff begin hepatitis C treatment. (Tr. 844). On February 16, 2016, Plaintiff's pharmacy called asking for physician approval for Plaintiff's medication. (Tr. 843). On March 2, 2016, Dr. Ghezel-Ayagh wrote a letter stating the current treatment recommended for Plaintiff. (Tr. 841).

On April 22, 2016, Plaintiff had an MRI of his lumbar spine. (Tr. 755). The MRI found straightening of the normal lumbar lordosis, moderate L4-L5 and L5-S1 degenerative disc disease, and mild L1-L2 degenerative disc disease. (Tr. 755). The MRI also indicated disc bulging with mild central canal stenosis at L1-L2, mild bilateral facet arthropathy at L3-L4, and mild disc bulging at L4-L5 that "indent[ed] the ventral thecal sac." (Tr. 755). The MRI also revealed "posterior ligamentous hypertrophy and bilateral facet arthropathy," as well as "mild/moderate bilateral spondylotic neural foraminal narrowing, left are [sic] then right." (Tr. 755). The MRI showed bilateral renal cysts as well. (Tr. 755). The impression stated that the MRI indicated

"[m]ultilevel lumbar degenerative disc disease with mild central canal stenosis at L1-L2." (Tr. 755).

On May 12, 2016, Plaintiff called to request the results of his MRI, which he had undergone two weeks prior. (Tr. 835). Plaintiff reported that he was attending physical therapy at "Dolson Ave Medical" and that the physical therapists needed his MRI results. (Tr. 835).

On June 6, 2016, Dr. Ghezel-Ayagh noted that they "need[ed] to restart the process for preapproval from scratch" because Plaintiff's previous lab results for hepatitis C were more than 6 months old. (Tr. 831). Dr. Ghezel-Ayagh noted that Plaintiff needed to come in for another lab report and that Plaintiff or his caseworker needed to be contacted in order to schedule this lab visit. (Tr. 831).

Plaintiff had an appointment with Dr. Yeon on June 16, 2016. (Tr. 823). The appointment notes recorded that Plaintiff visited because of his low back pain, which was persistent and radiated into his legs. (Tr. 826, 828). Plaintiff previously had an MRI to examine his low back pain, but wished for further evaluation. (Tr. 828). Dr. Yeon reviewed the prior MRI results with Plaintiff, and Plaintiff agreed to consider an epidural cortisone injection to treat his pain. (Tr. 829).

On June 23, 2016, a nurse called Plaintiff's case manager, stating Plaintiff needed to come in and sign a form so that a doctor could proceed with an "external appeal" and should schedule a lab appointment. (Tr. 820, 822). A few days later, on June 27, 2016, Plaintiff called to coordinate signing the appeal paperwork and to schedule a lab appointment for June 29. (Tr. 820). On June 29, 2016, Plaintiff had a "draw" done to examine his hepatitis C status. (Tr. 756).

On August 11, 2016, Plaintiff underwent an "XR" of the cervical spine after ongoing complaints of neck pain. (Tr. 758). The results indicated that there was a "1mm posterior subluxation present at C3-C4 and C4-C5 in neutral and in extension only, reducing when in flexion." (Tr. 758). The impression noted that there were "[g]rade 1 subluxations at C3-C4 and C4-C5 in neutral and in extension." (Tr. 758). Plaintiff also had an office visit that day, during which he complained of cervical spine pain and "bilateral arm radiating pain [with] no specific trauma." (Tr. 816). Plaintiff reported that this pain had been present for two months and requested further evaluation. (Tr. 816).

On September 8, 2016, Plaintiff missed an appointment. (Tr. 811). The day after that, September 9, 2016, Plaintiff had a "[f]ollow up of morbid obesity" and presented for a dressing change of an infected wound on his left arm. (Tr. 804, 808). The following day, September 10, 2016, Plaintiff had his wound dressing removed and replaced. (Tr. 798).

On September 12, 2016, Plaintiff called stating that he had visited "woundcare" and was told to cancel his follow up visit. (Tr. 797). Plaintiff wanted to know if cancelling his follow up appointment was "ok" and was advised to keep the appointment. (Tr. 797). Three days later, September 15, 2016, Plaintiff had an office visit to treat "HCV" and an abscess on his left arm. (Tr. 793). Plaintiff had been hospitalized the previous week for this problem and the abscess was "I&D and drained." (Tr. 793). Plaintiff was discharged with antibiotics and had two days of the antibiotic course left at the time of the appointment. (Tr. 793).

On September 19, 2016, Plaintiff had an office visit with Dr. Howard Karpoff to treat an abscess on his left arm, which he reported had been swelling for "a few days." (Tr. 783). Plaintiff stated that he believed he had been bitten by something, and had stuck the bite with

"a 'sewing needle'" to treat it. (Tr. 783). The pain and swelling had increased after this, and

Plaintiff wanted the abscess to be drained. (Tr. 783). Dr. Karpoff noted that "copious amounts

of seropurulent fluid" were expressed from the abscess, and that a culture was sent to be

analyzed. (Tr. 783).

On September 21, 2016, Plaintiff had an office visit with Dr. Thomas Booker to evaluate

his neck and low back pain. (Tr. 773). Plaintiff reported that the low back pain began 25 years

ago, and that his neck pain began 6 years ago. (Tr. 773). Plaintiff described his pain as a six out

of ten, and explained that it was characterized by "stabbing, sharp, numbness, weakness,

tightness and tingling." (Tr. 773). Plaintiff reported that his pain was exacerbated by standing

and by sitting, and was relieved by heat. (Tr. 773). Plaintiff stated that he had tried physical

therapy previously and was currently on medication to manage the pain. (Tr. 773). Plaintiff also

said that the pain radiated down both of his legs and into both of his arms. (Tr. 773). Dr. Booker

noted that the pain in Plaintiff's back and legs was from "bulging" at L4-5 and that the pain and

numbness in his hands were "likely from CTS," or Carpal Tunnel Syndrome. (Tr. 775).

On September 26, 2016, Plaintiff called to request an electronic script for wrist splints

"to sleep at night." (Tr. 771). On September 30, 2016, Plaintiff underwent nerve conduction

studies. (Tr. 766). His chief complaints were listed as neck pain and numbness in both hands.

(Tr. 766). All of the nerve conduction studies were within normal limits, as were Plaintiff's "F

Wave latencies." (Tr. 768). All of Plaintiff's examined muscles showed "no evidence of electrical

instability." (Tr. 768). Under "impressions," examiners noted that "[t]his [was] a normal study"

and that the examinations showed "[t]here is no electrodiagnostic evidence of

mononeuropathy, peripheral neuropathy, cervical radiculopathy, and myopathy." (Tr. 768).

On November 16, 2016, Plaintiff called to state that Medicaid "Transportation" would be faxing a medical transportation form. (Tr. 765). Plaintiff stated that he could not take the bus, as it was too far from the medical office. (Tr. 765). Plaintiff also expressed that Transportation "[n]eed[ed] to know why he can[']t walk." (Tr. 765). On November 23, 2016, "Phil for Access for the Living" called to confirm that Transportation had faxed over a form for Dr. Booker to fill out regarding Plaintiff's chronic back pain and difficulty walking long distances. (Tr. 764).

Plaintiff underwent an MRI of the cervical spine on December 27, 2016. (Tr. 759). The radiologist made findings that the cervical vertebrae demonstrated normal height, and that at C4-C5 there was "grade 1 retrolisthesis." (Tr. 759). The findings also noted that "[t]he facets" were well aligned, and that at C6-C7 there were "endplate osteophytes and disc space narrowing." (Tr. 759). There was also a "paracentral herniated protrusion without stenosis" at C2-C3, "left paracentral herniated protrusion results in mild left neural foramina stenosis" at C3-C4, "disc bulge osteophyte complex and left paracentral herniated protrusion results in mild central canal and mild left neural foramina stenosis" at C4-C5, "disc bulge osteophyte complex" resulting in "mild central canal and moderate left neural foramina stenosis" at C5-C6, and "disc bulge osteophyte complex" resulting in "mild central canal and mild bilateral neural foramina stenosis at C6-C7. (Tr. 759). The radiologist's impression noted that these findings showed "C3-C7 degenerative disc disease and spondylosis" resulting in "mild to moderate stenosis." (Tr. 759).

### 3.   Access Supports for Living

Plaintiff's records at Access Supports for Living date from September 2015 through 2017. (Tr. 660). Access Supports for Living appointment records showed that Plaintiff had a few appointments in 2008, and frequent appointments starting in September 2015 through June 2016. (Tr. 682-83). On September 14, 2015, Plaintiff completed a "PROS Screening and Admission Note" with Access Supports for Living. (Tr. 704). The goal of admission to PROS was to provide Plaintiff with "daily structured group support for development of healthy coping skills to manage anxiety and depression while maintaining sobriety and independent living." (Tr. 704). The form noted that Plaintiff would see "CRS" four days a week for two months and would see "CL" for "weekly counseling and symptom management group support," "biweekly individual counseling," and "monthly medication management" with a psychiatrist for two months. (Tr. 705).

On September 16, 2015, Plaintiff completed the Access Supports for Living Substance Use/Addictive Behaviors assessment. (Tr. 706). The assessment noted that the last time Plaintiff used heroin had been in April 2015, and that when Plaintiff was using heroin, he used 3 bags a day. (Tr. 706). Plaintiff estimated he smoked "about 10" cigarettes a day. (Tr. 706). The assessment noted that Plaintiff only reported heroin and tobacco use, but previous data indicated marijuana dependency and alcohol use as well. (Tr. 707). The assessment noted that a clinician would explore this discrepancy and "work closely with other supports from Resotartive [sic] Man." (Tr. 707). The assessment also noted that Plaintiff's previous suicide attempts in 2006 and 2009 were after significant losses in his life and were impulsive overdoses. (Tr. 709). Although Plaintiff denied having received previous clinical services at Access Supports for Living,

13

the assessment noted that there were records of Plaintiff in the computer system from several years ago. (Tr. 710). The assessment noted that Plaintiff "appeared very motivated to engage in treatment." (Tr. 711). Plaintiff's prognosis was listed as "guarded." (Tr. 716).

On February 9, 2016, Plaintiff had an appointment with Access Supports for Living, during which time a Psychopharmacology Psychotherapy Progress Note with Evaluation and Management form was completed. (Tr. 717). Plaintiff supported a stable mood, but requested a transfer to a clinic and complained of right shoulder pain. (Tr. 717). Plaintiff reported that he was "awaiting to see" an orthopedic surgeon to resolve the shoulder pain. (Tr. 718).

On March 8, 2016, another Psychopharmacology Psychotherapy Progress Note with Evaluation and Management form was completed during Plaintiff's appointment. (Tr. 719). Plaintiff reported "increased dysphoria and anxiety" related to stress regarding his food stamp benefits. (Tr. 719). Plaintiff was still waiting to see an orthopedic surgeon for his shoulder pain. (Tr. 720).

On April 1, 2016, Plaintiff completed a comprehensive assessment with Access Support for Living. (Tr. 661). This assessment stated that Plaintiff's developmental history "include[d] developmental and functioning, sensory and speech problems, [as well as] hearing and language problems." (Tr. 662). The assessment also noted two previous suicide attempts, one in 2006 and one in 2009, for which Plaintiff sought inpatient treatment programs previously. (Tr. 664). The assessment also recorded Plaintiff's ongoing depression, for which he was undergoing outpatient treatment, and two heroin-related inpatient treatments, one at the Richard C. Ward Addiction Treatment Center and one at "Restorative." (Tr. 664). Plaintiff reported having last used heroin in October 2015. (Tr. 673).

14

The assessment also noted that Plaintiff reported chronic back pain, as well as "untreated" hepatitis C, and that Plaintiff was "going for [an] MRI" regarding the back pain. (Tr. 666,669). The assessment noted that Plaintiff needed help managing his anxiety and that additional "coping/symptom management skills" "[w]ouldn't hurt." (Tr. 668).

On April 16, 2016, Plaintiff's progress notes observed that he reported his medication was helpful and that he had no side effects. (Tr. 721). On April 27, 2016, Plaintiff reported that he had discontinued use of marijuana and heroin and found his ongoing treatment at Restorative Management helpful. (Tr. 678). Plaintiff reported smoking a pack of cigarettes a day and was "in the contemplation stage" of quitting." (Tr. 679). Plaintiff's affect was described as "constricted." (Tr. 724).

On May 25, 2016, Plaintiff had a follow up appointment. (Tr. 726). During this appointment, Plaintiff's chief complaint was that he needed a medication refill and was frustrated by ongoing nerve pain. (Tr. 726). Plaintiff reported feeling frustrated that his pain specialist was not doing more to help him, but denied any feelings of hopelessness. (Tr. 726). Plaintiff also reported that his sleep was interrupted due to pain. (Tr. 726).

On April 6, 2017, Licensed Medical Social Worker ("LMSW") Phil Joseph of Access Supports for Living completed a Medical Source Statement for Psychiatric Disorders for Plaintiff. (Tr. 727-33). The statement covered the period of September 14, 2015 through April 7, 2017. (Tr. 727). LMSW Joseph listed Plaintiff's diagnosis as "Adjustment Disorder [with] Anxiety [and] Depressed Mood," "Major Depressive Disorder – Moderate," and "Opioid Use Disorder – Severe." (Tr. 727). He noted that Plaintiff's impairments had "already lasted, or can . . . be expected to last, for a minimum of 12 months," and that Plaintiff's psychiatric conditions

exacerbated Plaintiff's experience of pain caused by physical conditions. (Tr. 728-29). He also reported that, on average, Plaintiff would likely be absent from work more than 4 days a month because of his impairments or treatment. (Tr. 729).

LMSW Joseph further indicated that Plaintiff had mild limitations in understanding, remembering, or applying information and adapting or managing himself. (*Id*.). He reported that Plaintiff had moderate limitations in "concentration, persistence or maintaining pace resulting in failure to complete tasks in a timely manner." (Tr. 730). He also specified that Plaintiff experienced episodes of deterioration or decompensation that required Plaintiff to withdraw from a situation or experience an exacerbation of symptoms repeatedly, on three or more occasions. (Tr. 731). He stated that Plaintiff had mild difficulties in handling conflicts with others, regulating emotions and controlling his behavior, and maintaining personal hygiene. (Tr. 731-32).

Based on Plaintiff's psychiatric status, LMSW Joseph indicated that Plaintiff would have mild limitations in understanding, remembering, and carrying out instructions; moderate limitations in his ability to respond to customary work pressure; marked limitations in his ability to satisfy an employer's normal quality, production, and attendance standards; marked limitations in his ability to perform simple tasks on a sustained basis in a full-time work setting; and extreme limitations in his ability to perform complex tasks on a sustained basis in a full-time work setting. (Tr. 732).

### 4. Richard C. Ward Addiction Treatment Center

Plaintiff was admitted to the Richard C. Ward Addiction Treatment Center ("RCWATC") November 2, 2015. (Tr. 583). RCWATC noted that the reason for Plaintiff's self-referral was that

Plaintiff had been "unable to manage his cravings for IV heroin" and had been "self-medicat[ing] back pain and physical discomfort with other drugs including crack cocaine" during the past month. (Tr. 583-84). While he had no history of overdose, Plaintiff reported using heroin, his primary drug of choice, three to six times a week, and smoking one pack of cigarettes per day. (Tr. 585). Plaintiff also reported that he started using heroin three years prior, marijuana 15 years prior, and cocaine two years prior. (Tr. 585). RCWATC noted that Plaintiff had a history of depression and had arthritis. (Tr. 585).

Plaintiff reported having "several sober supports," but indicated that his drug use impacted his social life and exacerbated his depression. (Tr. 587, 589). Plaintiff told RCWATC that he used drugs to manage his back pain. (Tr. 589). He reported that he was charged with possession in April and also stated that he had been homeless for a period of five years, but was presently living in emergency housing. (*Id*.). RCWATC noted that Plaintiff attended an outpatient mental health clinic from August 2015 to the present date to treat his depression and had spent time in an inpatient program in 2009. (Tr. 590). Plaintiff listed his back injury and his depression as the imminent stressors in his life. (*Id*.). RCWATC recorded that Plaintiff expressed a desire to do physical therapy to treat his back pain. (Tr. 592). RCWATC described Plaintiff as looking older than his age and noted that Plaintiff said he was overwhelmed by his treatment plan and frequently got panic attacks when he was "like this." (Tr. 597). Under "Diagnostic Impressions," RCWATC listed that Plaintiff suffered from "Opiate, nicotine dependence," "Mixed Anxiety and Depressive Disorder," and "Urinary Bladder Dysfunction," and was "Hepatitis C +." (Tr. 597). Plaintiff was discharged from RCWATC on November 12, 2015, after ten days of treatment. (Tr. 601). His discharge form noted that Plaintiff was to

receive more care at "Occupations, Inc. – Access for Living and Restorative Management," and that Plaintiff became "overly anxious" during his inpatient experience despite "demonstrated improvement in self-awareness and recovery planning." (Tr. 601).

### 5. Cornerstone Family Healthcare

Plaintiff began treatment at the Center for Recovery at Cornerstone Family Healthcare on November 16, 2015. (Tr. 605). Plaintiff reported on his intake form that he has felt like he should cut down on his drinking or drug use before, and he has felt bad or guilty about his drinking or drug use. (Tr. 605). Plaintiff also reported that he has had a drink or used drugs first thing in the morning "to steady [his] nerves or to get rid of a hangover." (Tr. 605). Plaintiff also reported feeling nervous and "so depressed that nothing could cheer [him] up[] a little of the time" during the past thirty days; and hopeless, restless or fidgety, and worthless "some of the time." (Tr. 605). Plaintiff reported that it had felt like "everything was an effort[] all of the time" during the past thirty days. (Tr. 605). Plaintiff scored an 18 on the intake assessment, which is in the "mild to moderate" range, indicating that Plaintiff is likely to have a mild to moderate mental health disorder. (Tr. 605). Plaintiff also stated that he had last used heroin on November 15, 2015. (Tr. 606-07). Plaintiff was admitted to the Outpatient Rehabilitation program because he met the criteria of having an inadequate social support system. (Tr. 608).

On December 4, 2015, Plaintiff had a psychosocial assessment at Cornerstone Family Healthcare. (Tr. 613). The assessment noted that Dr. Branche would be working with Plaintiff and Plaintiff's counselor for "suboxone maintenance" would be Catherine Crecco. (*Id*.). Plaintiff reported last using heroin on November 15, 2015. (*Id*.). Plaintiff reported having three to four hours a day of free time and enjoying fishing and walking during this time. (Tr. 616). The goal of

Plaintiff's treatment was to "maintain the coping skills to use when experiencing high risk

situations or cravings" by March 3, 2016. (Tr. 618). Plaintiff was listed as having an opiate and

nicotine dependency, hepatitis C, bladder problems, and "medical issues," and lacking a sober

support network. (Tr. 619).

Plaintiff's urine was tested several times over the course of this treatment, including on

December 4, 2015, December 29, 2015, January 12, 2016, January 19, 2016, March 1, 2016,

March 16, 2016, April 6, 2016, April 26, 2016, and May 6, 2016. (Tr. 621, 624, 628, 632, 635,

638, 642, 646, 651).

### 6. Industrial Medicine Associate, P.C.

On April 26, 2017, Plaintiff had an internal medicine examination with Jay Dinovitser,

D.O., following a referral by the Division of Disability Determination for an internal medicine

examination. (Tr. 734). Plaintiff reported experiencing cervical spine pain since 2010, with

worsening symptoms over time. (*Id*.). Plaintiff described his cervical spine pain as constant,

severe, sharp, and radiating to his shoulders. (*Id*.). He also reported lower back pain that started

in 2000 and had worsened over time. (*Id*.). He said his lower back pain was constant, severe,

and aching. (*Id*.). He further specified that his lower back pain, at times, radiated into the backs

of his legs. (*Id*.).

Plaintiff also reported having COPD since 2015 that worsened over time and suffering

from shortness of breath when walking "a few blocks" or climbing two flights of stairs. (*Id*.).

Plaintiff had no history of COPD hospitalizations. (*Id*.). Plaintiff also noted having hepatitis C

since 2015, but stated that he had no symptoms. (*Id*.). Plaintiff also reported "having an atonic

bladder where he has to self-catheterize" since 2015. (*Id*.). Plaintiff explained that he did "not

urinat[e] in a normal way," but did not have dysuria, as he self-catheterized. (*Id*.). Plaintiff

reported a "foul odor of urine" and had an appointment scheduled with a Dr. Rowe to

investigate the possibility of a urinary infection. (*Id*.).

Plaintiff stated that he could sit and stand for 45 minutes and walk for 30 to 45 minutes.

(*Id*.). He also reported that he could climb two flights of stairs, but did so slowly and with

difficulty. (*Id*.). Plaintiff stated he had "severe difficulty" in bending and the ability to lift a half

gallon of milk. (*Id*.). Plaintiff reported cooking once a day and cleaning four times a week with

assistance. (Tr. 735). Plaintiff said he did his shopping once a month with assistance, showered

by himself five times a week, and dressed himself daily. (Tr. 735). Dr. Dinovitser noted that

Plaintiff "ambulate[d] with a moderately slow gait, looking at the floor when he walk[ed]," and

that Plaintiff was unable to walk on his toes and could only walk on his heels with difficulty. (Tr.

736).

Dr. Dinovitser also noted that Plaintiff's blood pressure was elevated, and that Plaintiff

could "[s]quat 50% of full with holding onto objects with both hands with difficulty." (Tr. 735-

36). Dr. Dinovitser stated that although Plaintiff's cervical spine showed full flexion, there was

"mild tenderness present." (Tr. 736). Plaintiff's lumbar spine also exhibited mild tenderness. (Tr.

737). Dr. Dinovitser noted that Plaintiff exhibited "3/5" strength in the upper and lower

extremities but that he believed Plaintiff did not use his full effort. (Tr. 737). Dr. Dinovitser also

noted "mild clubbing" of the extremities and mild "non-pitting edema" of the ankles. (*Id*.). Dr.

Dinovitser diagnosed Plaintiff with cervical spine pain, low back pain, COPD, hepatitis C, atonic

bladder, and hyperlipidemia. (*Id*.). Dr. Dinovitser believed Plaintiff's prognosis to be fair. (*Id*.).

The examination indicated that Plaintiff had moderate limitations in pushing and pulling, marked limitations in bending, moderate limitations in lifting and carrying, mild limitations in sitting, and moderate limitations in standing, walking, and stair climbing. (Tr. 737-38).

**D. Non-Medical Evidence**

**1. Plaintiff's Testimony**

Plaintiff testified, during questioning by his attorney, that he lived in New York and had been at his current address for 18 months. (Tr. 37). Prior to living at his current address, he was homeless for five years. (*Id*.) He explained that he was not employed and last worked in 2008 as an independent contractor/painter. (Tr. 38). This involved work such as interior and exterior painting, scraping before painting, priming, and fixing moldings. (Tr. 39). His previous work experience also included working in construction, factories, and other temporary work. (Tr. 38). He often worked eight hours per day. (*Id*.) Plaintiff said that he was diagnosed with chronic back pain, chronic neck pain, COPD, asthma, an atonic bladder, and also suffered from depression and anxiety. (Tr. 39). He stated that he was recovering from opioid dependence, attended treatment for 11 months, and was on suboxone. (Tr. 40). He said he saw a counselor twice a month, who regulated his suboxone use and administered urine tests. (*Id*.)

Plaintiff explained that his atonic bladder was due to him ripping his bladder, which caused him to be hospitalized for three days. (*Id*.). As a result, he had to use a catheter every four hours; this took 10-15 minutes each time. (Tr. 40, 49). Regarding his anxiety and depression, he testified that he saw a therapist once a week and also saw a psychiatrist. (Tr. 40). He explained that he has suffered from anxiety and depression for approximately ten years

and, to the best of his recollection, had been hospitalized twice for these conditions in 2006 and 2009. (Tr. 40-41).

Regarding his chronic neck and back pain, Plaintiff stated that he saw Dr. Booker for pain management and did physical therapy. (Tr. 41). Plaintiff said the physical therapy sessions "did absolutely no good." (*Id*.) He then described his COPD symptoms by explaining that he had to use an inhaler, experienced shortness of breath, and sometimes had a very hard time breathing. (*Id*.)

In addition to suboxone, Plaintiff said he took Wellbutrin, Trazodone for sleep, and medication for high cholesterol. (Tr. 41-42). He experienced side effects from the medication, which included "shakes," fatigue, feeling very hot, and trouble thinking. (Tr. 42). He explained that he did not sleep well, could not sleep on his back or stomach, and as a result, woke up every hour because his arms and hands went numb due to sleeping on his side. (*Id*.) Plaintiff said that he could not sit or stand for more than 45 minutes without experiencing pain. (Tr. 42-43). He did most of his housework but had a friend visit a couple of days per week to help him. (Tr. 43). He did his own grocery shopping but had to stop at least three or four times during the walk due to shortness of breath, which was helped with an asthma pump. (*Id*.) He used a cart to transport groceries because he could not carry much weight. (*Id*.)

When the ALJ began questioning Plaintiff, Plaintiff stated his weight had increased significantly due to his medications. (Tr. 44). Plaintiff explained that he lived alone in a second-floor apartment, for which he received housing assistance, and had to climb approximately 20 steps to reach his apartment. (Tr. 45, 46). He had difficulty climbing the stairs and had to use the hand railing to go up the steps. (Tr. 45).

Plaintiff explained that his highest level of education was high school. (*Id*.) He explained that he had not had consistent work since 2008 because he entered a shelter and lived off of unemployment benefits. (Tr. 46). After his unemployment ran out in 2010, he became homeless until 2015, at which point he was able to get into a shelter. (Tr. 46-47). Plaintiff then explained that his medications helped with his pain and symptoms "to a certain point" but that he was still in pain with the medication. (Tr. 47). Regarding his mental condition, he said that he got easily frustrated, became unable to "cope with things," had trouble with his memory, and experienced anxiety due to his pain and inability to find a method to control it. (Tr. 48). Plaintiff said he occasionally had trouble being around other people. (*Id*.) He explained that he could read, watch television, and use a computer, but had to get up frequently to help with his pain. (Tr. 48-49).

Plaintiff testified that he was "lucky if he [could] carry a little bit over five pounds" because doing so caused pain in his arms and pressure on his neck and down into his back. (Tr. 50). He could walk approximately three blocks, but doing so took a long time. (*Id*.) He could sit for 30-45 minutes at a time before having to get up and walk around due to pain. (Tr. 51). He sometimes had difficulty getting dressed in the morning. (*Id*.) He did not participate in any clubs, activities, or hobbies. (Tr. 52). He cooked for himself but nothing that took a long time. *(Id.)*. He did his own laundry using a push cart at a laundromat two blocks away, and a friend handled most of his cleaning during visits three times per week. (Tr. 53).

Plaintiff testified that he smoked but was trying to quit. (*Id*.) Regarding his asthma and COPD, he stated that various things triggered symptoms such as walking too far, fumes, odors, dust, and gases. (Tr. 53-54). As a result, he tried to stay away from chemicals. (Tr. 54).

### 2. Vocational Expert Testimony

The ALJ first asked the VE about an individual with Plaintiff's age, education, and work experience but the residual functional capacity ("RFC") of, *inter alia*, (a) lifting and carrying 20 pounds occasionally, (b) standing and walking for four hours a day, (c) sitting for six hours a day, (d) not being able to climb ladders, ropes, or scaffolds, (e) avoiding concentrated exposures to odors, dusts, fumes, and gases, and (f) understanding, remembering, and carrying out only simple, routine, repetitive, non-complex tasks. (Tr. 56). The VE testified that such an individual with that RFC would not be able to perform Plaintiff's past work as a painter. (*Id*.) The VE further testified, however, that such an individual could still perform clerical work, for example, as a photocopy machine operator, collator operator, or marker. (Tr. 56-57). The ALJ then asked about an individual with the same limitations but that also needed to take unscheduled breaks possibly resulting in being off-task for more than fifteen percent of the day. (Tr. 56). The VE admitted that no past work or jobs in the national economy would be available if the individual had to take such breaks. (Tr. 57).

The ALJ then presented a hypothetical RFC of an individual with, *inter alia*, (a) lifting and carrying 10 pounds occasionally, (b) standing and walking for two hours a day, (c) sitting for six hours a day, (d) not being able to climb ladders, ropes, or scaffolds, (e) avoiding concentrated exposures to odors, dusts, fumes, and gases, and (f) understanding, remembering, and carrying out only simple, routine, repetitive, non-complex tasks. (*Id*.) The VE testified that such an individual also could not work as a painter, but could find work sedentary work, including as a food and beverage order clerk, call out operator, or document preparer. (Tr. 57-58). As with the previous hypothetical, the VE then testified that such an individual could not perform any past

work or jobs in the national economy if faced with the additional limitation of needing to take

unscheduled bathroom breaks resulting in being off-task for more than fifteen percent of the

workday. (Tr. 58).

Plaintiff's attorney then examined the VE by asking a single question about whether the

three sedentary jobs mentioned (order clerk, call out operator, and document preparer) require

transferable skills. (Tr. 59). The VE responded that they do not. (*Id.*)

III.   <u>**Analysis**</u>

A.   <u>**Applicable Legal Principles**</u>

1.   **Standard of Review**

A motion for judgment on the pleadings should be granted if the pleadings make it clear

that the moving party is entitled to judgment as a matter of law. However, the Court's review of

the Commissioner's decision is limited to an inquiry into whether there is substantial evidence

to support the findings of the Commissioner and whether the correct legal standards were

applied. Substantial evidence is more than a mere scintilla but requires the existence of

"relevant evidence as a reasonable mind might accept as adequate to support a conclusion,"

even if there exists contrary evidence. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see

also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of

review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may not

determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a

reasonable factfinder would *have to conclude otherwise*." *Id*.

## 2. Determination of Disability

To be awarded disability benefits, the Social Security Act requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 416.905(a). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps; only after all four steps are satisfied does the burden then shift to the Commissioner for the final step. 20 C.F.R. § 416.920.

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits her ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 ("Listings") such that she may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's RFC, or her ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC precludes her from meeting the physical and mental demands of her prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing some other work that exists in the national economy.

B. **The ALJ's Decision**

ALJ Singh issued an unfavorable decision to Plaintiff upon applying the five-step process. (Tr. 14-26). After finding that Plaintiff had not engaged in substantial gainful activity since the application date, ALJ Singh found that Plaintiff suffered from the following severe impairments: dysuria, COPD, asthma, atonic bladder, cervical and lumbar degenerative disc disease with radiculopathy, depression, and substance abuse. (Tr. 16). At the third step, ALJ Singh found that Plaintiff's severe impairments did not meet the criteria of any of the Listings such that he would be considered presumptively disabled. (*Id.*)

ALJ Singh then found that Plaintiff had the RFC to perform light work with the following limitations:

- Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently;

- Plaintiff can sit six hours in an eight-hour workday and stand and/or walk four hours in an eight-hour workday;

- Plaintiff can never climb ladders, ropes, and scaffolds;

- Plaintiff can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs;

- Plaintiff must avoid concentrated exposure to odors, dusts, fumes, and gases;

- Plaintiff is limited to understanding, remembering, and carrying out simple, routine, repetitive, non-complex tasks.

(Tr. 18-19). In making this determination, ALJ Singh did not fully credit Plaintiff's subjective reports of his limitations after finding that Plaintiff's testimony was inconsistent with the medical evidence in the record. (Tr. 19). Specifically, the ALJ found that Plaintiff had "not

27

generally received the type of medical treatment one would expect for a totally disabled individual," and stated that the treatment had been "essentially routine and/or conservative in nature, consisting primarily of medication management and physical therapy." (Tr. 22). ALJ Singh further found that Plaintiff's medications had been relatively effective at controlling Plaintiff's symptoms, that the record did not support his claim of various side effects from their use, and that he "has not provided convincing details regarding factors which precipitate the allegedly disabling symptoms, claiming that the symptoms are present 'constantly' or all of the time." (*Id.*)

ALJ Singh also explained that Plaintiff's admitted abilities and daily living activities supported her RFC determination, as they were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.*) Moreover, she highlighted Plaintiff's testimony in which he said that "he stopped working because his employer ran out of work, not due to his medically determinable impairments." (*Id.*)

The ALJ also gave some weight to consultative examiner Dr. Dinovitser's opinion that Plaintiff had moderate limitations in lifting, carrying, pushing, pulling, standing, walking, and climbing; marked limitations in bending; and mild limitations in sitting. (Tr. 22-23). The ALJ noted Dr. Dinovitser's findings were based on a single personal examination and that he was not able to review the entire record before rendering an opinion. (Tr. 23). Given the record as a whole, ALJ Singh stated that the reductions to standing, walking, and the postural limitations were "over-restrictive" and that Dr. Dinovitser also "did not accommodate [Plaintiff's] respiratory impairments with environmental limitations." (*Id.*)

ALJ Singh gave some weight to LMSW Joseph's opinion that Plaintiff's psychiatric symptoms exacerbated his pain or other physical symptoms; that he would have mild limitations understanding, remembering, or applying information; no limitations interacting with others; moderate limitations with concentrating, persisting, or maintaining pace; mild limitations with adaptation; mild limitations in handling conflicts with others, regulating emotions, maintaining personal hygiene, and understanding remembering, and carrying out instructions; extreme limitations to performing complex tasks on a sustained full-time basis; marked limitations in satisfying normal quality, production, and attendance standards and performing simple tasks on a sustained full-time basis; and moderate limitations in responding to customary work pressure. (Tr. 23). The ALJ found that the medical record partially supported LMSW Joseph's opinion, but that it did not "reflect the limitations to performing simple tasks or satisfying production and attendance standards[.]" (*Id.*) Further, ALJ Singh found the opinion "somewhat internally inconsistent" because the "specific limitations provided [were] not consistent with the overall mild to moderate general limitations provided in the same opinion[.]" (*Id.*)

ALJ Singh gave little weight to the GAF assessments given in September 2015 and December 2015. (*Id.*) She stated:

> GAF scores are not very reliable or persuasive regarding a person's overall mental functioning because they are subjective and based on a single interaction as opposed to the entirety of the longitudinal medical record, and can vary widely from date to date. GAF scores represent snapshots at particular moments in time, which are often rather context-driven, with no inferable longitudinal pattern. No narrative explanations describing how the providers came to these GAF score[s] was included, rendering the opinions vague and conclusory. The scores also only cover the period of September to December 2015, so I do not find them to be very persuasive as to the claimant's persistent mental functioning level.

(Tr. 23-24).

Based on this RFC and the VE's testimony, The ALJ concluded that Plaintiff was capable

of "making a successful adjustment to other work that exists in significant numbers in the

national economy." (Tr. 25-26). Accordingly, the ALJ found that Plaintiff was not disabled. (Tr.

26).

### C.  Analysis of the ALJ's Decision

Plaintiff has not filed or served any opposition to the Commissioner's Motion for

Judgement on the Pleadings or requested an extension of time in which to file and serve

opposition papers. However, I consider the merits of the Commissioner's motion despite

Plaintiff's failure to respond. I specifically address whether: (1) the ALJ failed to fully apply the

proper legal standard in determining that some of Plaintiff's impairments did not meet the

requisite level of severity; (2) whether the ALJ failed to properly evaluate Plaintiff's credibility as

to his subjective complaints of pain; and (3) whether the ALJ failed to adequately account for

Plaintiff's back or bladder problems in determining his RFC. (ECF 17 at 43-44). Ultimately, I find

that the ALJ failed to account for Plaintiff's bladder issues, and his related need to take breaks,

in determining Plaintiff's RFC.

### 1.  Severity of Impairments

If the ALJ improperly analyzed Plaintiff's non-severe impairments individually rather

than their combined effect, remand is warranted. *See* 42 U.S.C. § 423 (d)(2)(B) ("the

Commissioner of Social Security shall consider the combined effect of all of the individual's

impairments without regard to whether any such impairment, if considered separately, would

be of such severity."). Any failure by the ALJ to consider the effect of any of Plaintiff's issues

when combined with other impairments is harmless "where the ALJ also later considers the effects from the omitted impairment as part of the ultimate RFC determination." *See Matta v. Colvin*, No. 13-CV-5290 (CS) (JCM), 2016 WL 524652, at *12 (S.D.N.Y. Feb. 8, 2016); *see also Palacios v. Berryhill*, No. 17-CV-4802 (ALC), 2018 WL 4565141, at *9 (S.D.N.Y. Sept. 24, 2018) (finding ALJ's representation that "the undersigned has considered all symptoms" in the RFC determination sufficient even though an impairment may have been wrongly considered non-severe). Here, the ALJ proceeded to Step Three and represented in the RFC determination that "I have considered all symptoms." (Tr. 19). In the RFC analysis section, the ALJ referenced Plaintiff's medical records and testimony regarding his pain, as well as Dr. Dinovitser's and LMSW Joseph's opinions on Plaintiff's limitations. (Tr. 22-23). Therefore, the ALJ considered, albeit cursorily, Plaintiff's non-severe impairments and limitations. Accordingly, even if the ALJ erred in finding certain issues non-severe, the ALJ's consideration of Plaintiff's non-severe issues as part of the RFC analysis rendered any such error at Step Two harmless.

### 2.  Plaintiff's Credibility

If ALJ Singh merely recited the necessary factors for evaluating the credibility of Plaintiff's testimony and did not engage in the necessary analysis, remand would be proper. Subjective testimony regarding limitations can form the basis of finding a disability. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010). In analyzing Plaintiff's subjective complaints, the ALJ must conduct a two-step test: first, determine whether Plaintiff suffers from an impairment that "could reasonably be expected to produce the symptoms alleged," and then, if such an impairment exists, analyze the extent to which Plaintiff's symptoms are consistent with the objective evidence in the record. *Hofsommer v. Berryhill*, 322 F. Supp. 3d 519, 530 (S.D.N.Y.

2018) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)). At this second step, the ALJ

should consider seven symptom-related factors:

> (1) claimant's daily activities; (2) location, duration, frequency, and intensity of
> claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage,
> effectiveness, and side effects of any medication taken to relieve symptoms; (5)
> other treatment received to relieve symptoms; (6) any measures taken by the
> claimant to relieve symptoms; and (7) any other factors concerning claimant's
> functional limitations and restrictions due to symptoms.

*Sanchez v. Astrue*, No. 07-CV-9318 (DAB), 2010 WL 101501, at *13 (quoting *Gittens v. Astrue*,

No. 07-CV-1397 (GAY), 2008 WL 2787723, at *4 (S.D.N.Y. June 23, 2008)). Listing each of the

seven factors is not necessary where the decision shows the ALJ evaluated Plaintiff's credibility

by considering all of the relevant evidence. *See Lao v. Colvin*, No. 14-CV-7507 (ADS), 2016 WL

2992125, at *16 (E.D.N.Y. May 23, 2016). If the ALJ rejects Plaintiff's testimony as not credible,

they must explain such rejection "with sufficient specificity to enable the reviewing Court to

decide whether there are legitimate reasons for the ALJ's disbelief." *Calzada*, 753 F. Supp. 2d at

280 (quoting *Fox v. Astrue*, No. 6:05-CV-1599 (NAM) (DRH), 2008 WL 828078, at *12 (N.D.N.Y.

Mar. 26, 2008)).

Here, ALJ Singh conducted the necessary two-step test and concluded at the first step

that Plaintiff's "medically determinable impairments" could reasonably be expected to produce

Plaintiff's reported symptoms. (Tr. 21). The ALJ then properly analyzed whether those areas of

pain were supported by the objective evidence in the record. (Tr. 21-22). The ALJ pointed to the

fact that Plaintiff's medical treatment has largely been routine medication management and

physical therapy, as opposed to "the type of medical treatment one would expect for a totally

disabled individual." (Tr. 22). The ALJ also referenced Plaintiff's ability to largely cook and clean

for himself. (Tr. 19, 22). The ALJ noted that Plaintiff's medications seemed relatively effective in controlling Plaintiff's symptoms. (Tr. 22).

The ALJ did not err in failing to devote a significant amount of detail to analysis of Plaintiff's pain claims. In addition to considering the above objective evidence, the ALJ was within her discretion in finding Plaintiff's testimony about the effects of his pain, when compared with the objective medical record, suggested a lesser severity than claimed. ALJ Singh noted that Plaintiff's admitted abilities and daily living activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 22). Moreover, ALJ Singh highlighted that Plaintiff testified that he "stopped working because his employer ran out of work," rather than as a result of his medically determinable impairments. (Tr. 22).

Accordingly, ALJ Singh did not err in finding that Plaintiff's testimony about the severity of his pain was not supported by objective evidence in the record. *See Burch v. Comm'r of Social Security*, No. 15-CV-9350 (GHW), 2017 WL 1184294, at *11-12 (S.D.N.Y. Mar. 29, 2017) (deferring to ALJ's credibility determination where there was evidence in the record to find a lack of credibility); *Zentack v. Astrue*, No. 10-CV-1526 (JS), 2012 WL 4364516, at *8 (E.D.N.Y. Sept. 21, 2012) ("The Court will uphold the ALJ's decision to discount a claimant's subjective complaints of pain so long as the decision is supported by substantial evidence.").

### 3. RFC

#### a. Back Use

The ALJ failed to examine or seek out treatment notes from Plaintiff's physical therapist(s). Although "a physical therapist is not an acceptable medical source . . . due

controlling weight," s*ee Brush v. Berryhill*, 294 F. Supp. 3d 241, 257 (S.D.N.Y. 2018), the ALJ

must still "explain the weight given to opinions from these sources" or otherwise show that

such opinions were considered. 20 C.F.R. § 416.927(f)(2).

The ALJ did not examine any treatment notes from Plaintiff's physical therapist, but did

address Plaintiff's complaints of ongoing severe back pain. The ALJ referenced Plaintiff's

testimony regarding his physical therapy and the record, which frequently referenced Plaintiff's

physical therapy. (Tr. 21-23). The ALJ explained that the evidence in the record established that

Plaintiff had degenerative disc disease, amongst other impairments. (Tr. 21). Plaintiff takes

medication to help control the pain and according to the record, these medications do not

cause substantial side effects. (Tr. 22). The ALJ also considered Plaintiff's subjective complaints

of back pain, *id*., to which the Court must give deference. *See Aponte v. Secretary, Dep't of

Health and Human Servs*., 728 F.2d 588, 591 (2d Cir. 1984) ("the court must uphold the ALJ's

decision to discount a claimant's subjective complaints of pain" if there is "substantial

evidence" in support). Therefore, even though ALJ Singh did not examine or analyze treatment

notes from a physical therapist, the ALJ did analyze the evidence in the record concerning

Plaintiff's back pain and cited substantial evidence.

b.  Bladder Issues and Work Interruptions

As discussed above, the ALJ did not err in not finding credible Plaintiff's claims of the

severity of his pain. This is different, however, from whether Plaintiff's dysuria and atonic

bladder issues have any impact on his ability to work. *See Westcott v. Colvin*, No. 12-CV-4183

(FB), 2013 WL 5465609, at *5 (E.D.N.Y. Oct. 1, 2013). There is evidence that Plaintiff would

need to take at least some breaks at work due to his urinary issues. (*See* Tr. 40, 49). Plaintiff

described difficulties self-catheterizing and needing to self-catheterize every four hours in order to urinate, a process which takes 10-15 minutes each time. (Tr. 40, 49, 896).

Instead, the ALJ ignored the evidence in the record regarding Plaintiff's need to take breaks during the workday regarding Plaintiff's urinary needs, in addition to Plaintiff's psychiatric needs. The ALJ seemed to recognize this limitation of Plaintiff and asked the VE about an individual with Plaintiff's age, education, and work experience but the RFC of, *inter alia*, (a) lifting and carrying 20 pounds occasionally, (b) standing and walking for four hours a day, (c) sitting for six hours a day, (d) not being able to climb ladders, ropes, or scaffolds, (e) avoiding concentrated exposures to odors, dusts, fumes, and gases, and (f) understanding, remembering, and carrying out only simple, routine, repetitive, non-complex tasks. (Tr. 56). The VE testified that the jobs identified as suitable for a person with that RFC would not be available if the individual had to take breaks resulting in being off-task for more than fifteen percent of the day. (Tr. 57). The ALJ did not ask the VE to consider how many days a month an employee could miss work or what percent of the day an employee could be off-task. The ALJ instead only asked the VE about tolerance for being off-task more than fifteen percent of the day *after* inquiring as to jobs in the economy available to Plaintiff. (Tr. 58). Therefore, the conclusion that Plaintiff could perform the jobs noted by the VE not only did not account for evidence in the record regarding the need for at least some breaks and missing some days of work a month, but also failed to include the VE's opinion on the subject. Accordingly, the ALJ's determination that Plaintiff could perform some work in the national economy based on his RFC and the VE's testimony was not supported by substantial evidence.

IV.   **Conclusion**

For the foregoing reasons, the Commissioner's Motion for Judgment on the Pleadings is

**DENIED**, and the case is remanded for further proceedings consistent with this opinion

pursuant to 42 U.S.C. § 405(g).

The Clerk of Court is respectfully directed to mail a copy of this Order to *pro se* Plaintiff,

close the motion at ECF 18, and close the case.

**SO ORDERED.**


_s/  Ona T. Wang_____

Dated: March 29, 2021                               **Ona T. Wang**
      New York, New York                      United States Magistrate Judge